**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| STEVEN MANN, LASHELL EPPERSON, JUDITH HARRISON, and KEVIN WILLIAMS, *on behalf of themselves and all individuals similarly situated,* | Civil Action No. 3:20-cv-820 |
| Plaintiffs, | |
| v. | |
| PRINCETON ALTERNATIVE FUNDING, LLC, PRINCETON ALTERNATIVE INCOME FUND, L.P., PHILIP BURGESS, ALONZO PRIMUS, WALTER WOJCIECHOWSKI, MICROBILT FINANCIAL SERVICES CORPORATION, LJP CONSULTING, LLC, PHILIP GOMEZ, MICHAEL GOMEZ, CHRIS MCCLOUD, VIVIAN MCCLOUD, and JOHN DOES 1-15. | |
| Defendants. | |

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Steven Mann, Lashell Epperson, Judith Harrison, and Kevin Williams ("Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants, they allege as follows:

## INTRODUCTION

1.      This case arises from the making and collection of unlawful loans from online lending entities *purportedly* owned and operated by the Big Valley Band of Pomo Indians, a federally recognized Native American tribe. These loans impose triple-digit interest rates, exponentially higher than the interest rate cap permitted by state laws, such as the Commonwealth of Virginia, which mandates a 12% interest rate cap on loans made to Virginians like Plaintiffs

Mann and Epperson. *See* Va. Code § 6.2-303. The loans are similarly illegal in Pennsylvania and Georgia where Plaintiffs Harrison and Williams reside and obtained their loans.

2.      Seeking to ostensibly avoid state usury laws, Defendants established what is commonly referred to as a tribal lending business model—"the most recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).  Under this model, non-tribal payday lenders originate their loan products through a company "owned" by a Native American tribe and organized under its laws. The tribal company serves as a conduit for the loans, facilitating a dubious and legally incorrect claim that the loans are subject to tribal law, not the protections created by state usury and licensing laws. In exchange for the use of its name on the loan, the tribal company often receives only a small portion of the revenue and does not meaningfully participate in the day-to-day operations of the business. Regardless of the tribe's level of participation in the operations, however, the loans are illegal because it is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973).

3.      Despite the overwhelming authority regarding the illegality of these loan products, Defendants made, collected, and/or received interest from high-interest loans originated in the names of FreedomCashLenders, Tremont Lending, Layma d/b/a Little Lake Lending, and Credit Cube—four entities formed under tribal law to serve as the fronts to disguise the non-tribal payday lenders' role and to ostensibly shield the scheme by exploiting sovereign immunity. The non-tribal defendants—Princeton Alternative Funding, LLC, Philip Burgess, Alonzo Primus, Microbilt

Financial Services Corporation, Walter Wojciechowski, LJP Consulting—provide the capital used to make the loans and, in return, receive the vast majority of the profits of the illegal lending enterprise. And by virtue of their investment and critical role in the illegal lending enterprise, Defendants have been permitted and have participated in key decisions, strategies, and objectives of the lending businesses, ensuring protection and maximize return on their investments.

4.     The tribal defendants—Philip Gomez, Michael Gomez, Chris McCloud, and Vivian McCloud—are the Tribal Council members of the Big Valley Band of Pomo Indians. Although they may be motivated by their intention of advancing their own community, their effort to advance themselves exploits desperately poor people in other communities who, in their moment of despair, agree to take a small dollar loan with triple-digit interest rates. The Tribal Council's consent, authorization, and participation is a necessary component of the illegal lending enterprise and, thus, is instrumental in facilitating the creation of the illegal loans.

5.     Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, which was expressly enacted "to seek the eradication of organized crime in the United States," including loan sharking. Pub. L. 91–452; *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 839 (4th Cir. 1990) (explaining that RICO "makes it unlawful for 'any person'—not just mobsters—to use money derived from [the unlawful collection of debt] to invest in an enterprise, to acquire control of an enterprise through [the unlawful collection of debt], or to conduct an enterprise through the [unlawful collection of debt]."). Here, the non-tribal defendants acquired and maintained in interest in the illegal lending enterprise; and all defendants participated in the affairs of the enterprise and conspired to violate RICO.  Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962(b)-(d).

6.      Plaintiffs also assert a class claim for violations of state usury laws and unjust enrichment. Even though the loans were void as a matter of law in many states (and otherwise usurious in every other state except Utah and Nevada), Defendants nonetheless were involved in the making of the usurious loans and receipt of the usurious proceeds thereof. Accordingly, on behalf of themselves and other class members, Plaintiffs seek to disgorge all amounts paid on the void loans or in excess of a consumers' state interest rate, as well as other available statutory remedies and their attorneys' fees and costs.

## JURISDICTION

7.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants have transacted their affairs in Virginia, including the making and collection of loans to likely thousands of Virginians. Additionally, venue is also proper in this Court pursuant to 28 U.S.C. § 1965(b) because Plaintiff Mann is a resident of this District and Division and a substantial part of Plaintiff Mann's claims occurred in Virginia.

## PARTIES

9.      Plaintiff Steven Mann ("Mann") is a natural person and resident of this Division and District.

10.     Plaintiff Lashell Epperson ("Epperson") is a natural person and resident of this District.

11.     Plaintiff Judith Harrison ("Harrison") is a natural person and resident of the Commonwealth of Pennsylvania.

12.     Plaintiff Kevin Williams ("Williams") is a natural person and resident of Georgia.

13.     Defendant Princeton Alternative Funding, LLC is "a fund management company and general partner of the Princeton Alternative Income Fund (PAIF)."[1] Princeton Alternative Funding is a self-described "debt fund that provides credit facilities" to "consumer-facing finance companies in the alternative lending marketplace." *Id*. In other words, Princeton Alternative Funding provides capital (often tens of millions of dollars) to finance companies, including to illegal lenders like FreedomCashLenders, Tremont Lending, Little Lake Lending, and Credit Cube.

14.     Defendant Princeton Alternative Income Fund (PAIF) is an investment fund created by Princeton Alternative Funding. Upon information and belief, PAIF is a pooled investment fund created to raise and provide the capital to fund the illegal loans and, in return, the vehicle upon which profits are returned to Princeton Alternative Funding and its investors.

15.     Defendant Phillip Burgess is a natural person and indirectly owns the majority of the shares in Princeton Alternative Funding, LLC and PAIF. As Burgess explained in his sworn testimony in another case: he has held an ownership interest in PAIF for "over 25 years" and he has "been in the business-to-business lending industry for about 35 years." In this capacity, Burgess is one of the primary individuals who participates in raising the capital to be provided to the lenders and who negotiates the terms of the loan and security agreements with the lenders. Through software and data available to Burgess as a result of his ownership of a consumer reporting agency, Burgess also monitors the loans to the consumers and ensures the timely servicing and collection of the loans.

---

[1] *See* Princeton Alternative Funding, http://www.princetonalternativefunding.com (last visited on October 14, 2020).

16.     Defendant Alonzo Primus is a natural person and indirectly owns or has owned shares of PAIF. According to the United States Trustee for the United States Bankruptcy Court for New Jersey, Primus assisted Burgess with the creation of PAIF and was its Chief Credit Officer. Primus is also the majority shareholder of Defendant LJP Consulting, which is one of the two managing members of PAIF.

17.     Defendant Walter Wojciechowski is a natural person who owns some of the shares in PAIF. In addition, Wojciechowski is the chief financial officer of PAIF and, thus, he is the executive responsible for managing the financial actions of PAIF, including its decision when to deploy more capital to the illegal lenders.

18.     Defendant Microbilt Financial Services Corporation is a company owned by Burgess and his family—either directly or indirectly. Microbilt Financial Services Corporation is a holding company, which owns about 53% of PAIF.

19.     Defendant LJP Consulting, LLC is a company owned by Primus—either directly or indirectly. Through LJP Consulting, Primus owns his shares of PAIF, both his equity interest as well as voting/managing interests.

20.     Philip Gomez is the Chairman of the Tribal Council of the Big Valley Band of Pomo Indians. Although the tribal lending entities claim may be  entitled to immunity, the Supreme Court has held that "tribal immunity does not bar" a "suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). Tribal sovereign immunity is also "simply not in play" when a person seeks recovery from a tribal employee in his or her individual capacity—even when the wrongful conduct was within the scope of tribal employment. *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017).

Based on the misconduct alleged herein, Plaintiffs seeks an injunction against Chairman Gomez in his official capacity, as well as damages from him in his individual capacity.

21.     Michael Gomez is the Vice Chairman of the Tribal Council of the Big Valley Band of Pomo Indians. Based on the misconduct alleged herein, Plaintiffs seeks an injunction against Vice Chairman Gomez in his official capacity, as well as damages from him in his individual capacity.

22.     Chris McCloud is the Treasurer of the Tribal Council of the Big Valley Band of Pomo Indians. Based on the misconduct alleged herein, Plaintiffs seeks an injunction against Treasurer McCloud in his official capacity, as well as damages from him in his individual capacity.

23.     Vivian McCloud is the Secretary of the Tribal Council of the Big Valley Band of Pomo Indians. Based on the misconduct alleged herein, Plaintiffs seeks an injunction against Secretary McCloud in her official capacity, as well as damages from her in her individual capacity.

24.     Defendant John Doe Nos. 1-15 are unidentified parties who participated in the enterprise with the Defendants, including but not limited to entities who aided, abetted, and facilitated the conspiracy to collect the unlawful amounts from consumers.

## FACTUAL BACKGROUND AND ALLEGATIONS

**A.     State usury and licensing laws protect consumers from usurious loans.**

25.     "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

26.     Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders.

27.     By way of example, Virginia's general usury statute—absent certain exceptions—provides that "no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year." Va. Code § 6.2-303(A).

28.     In addition to the general usury laws embodied in Virginia's chapter entitled "Interest and Usury," Virginia's legislature has enacted the Consumer Finance Act ("CFA"), which is "part of a comprehensive statutory, financial, and regulatory structure dating back to at least 1918," when it was known as the Small Loan Act. *Commonwealth v. NC Fin. Sols. of Utah, LLC*, 100 Va. Cir. 232 at *5 (2018).

29.     The legislature enacted this statute because "the conduct of such business has long been the cause of general complaint and of much hardship and injustice to borrowers, and there is no regulation or provision of law which has proved effective for the protection of borrowers and for the punishment of usurious money lenders." *Id*. (quoting 1918 Va. Acts, ch. 402.); *see also Sweat v. Commonwealth*, 152 Va. 1041, 1057 (1929) (explaining that legislature enacted the Act in response "money loan sharks and salary-buyers.").

30.     Unlike the general usury statutes, the CFA "requires all who engage in the business of making noncommercial personal loans in Virginia to be licensed, and therefore regulated and supervised by the [Secretary of the Commonwealth]." *Id*. at *6 (citing Va. Code § 6.2-1501(A)).

31.     "The Legislature intended such lenders be subject to distinct scrutiny, including examination of their affairs and records no less than once every three years." *Id*. at *6 (citing Va. Code § 6.2-1531).

32.     Critically, "[n]o distinction is made in the statute between domestic or foreign-based lending entities," *id*., such as tribal lenders.

33.     If a person violates the interest rate cap, the CFA imposes severe consequences, including criminal liability and forfeiture of all principal, interest, and any charges related to the loan. Va. Code § 6.2-1540 (making it a class 2 misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); Va. Code § 6.2-1541(A) (declaring such loans "void" and principal uncollectible).

34.     Similarly, short term loans of $3,000 or less fall within the scope of the Georgia Industrial Loan Act. Ga. Code Ann. §§ 7-3-1, et seq.

35.     The purpose of Georgia's Industrial Loan Act is to "to define and prevent usury." *Georgia Cash Am., Inc. v. Greene*, 734 S.E. 2d 67, 71 (2012) (citation omitted).

36.     Unless expressly exempted by the terms of the Industrial Loan Act, a lender must obtain a license by the Industrial Loan Commissioner to make loans of $3,000 or less at an interest rate exceeding eight percent (8%). Ga. Code Ann. §§ 7-3-5, 7-3-6, 7-3-8.

37.     Pursuant to Ga. Code Ann. § 7-3-29(a), "[a]ny person who shall make loans under [the Industrial Loan Act] without first obtaining a license . . . shall be guilty of a misdemeanor; and any contract made under [the Industrial Loan Act] by such person shall be null and void."

38.     Georgia's Payday Lending Act also prohibits lenders from making loans of $3,000 or less at an interest rate that exceeds eight percent (8%) unless licensed to make such loans under the Industrial Loan Act or other laws regulating financial institutions. Ga. Code Ann. §§ 16-17-1, et seq.

39.     A lender who violates of the Payday Lending Act "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both." Ga. Code Ann. § 16-17-2(d).

40.     Ga. Code § 16-17-3 bars a lender from collecting any indebtedness created by the illegal loan and declares the loan "void ab initio."

41.     Likewise, under Section 201 of the Loan Interest and Protection Law (hereinafter "LIPL"), the maximum lawful rate of interest for the loan and use of money in amounts less than $50,000 is six percent per year. 41 P.S. § 201.

42.     The six-percent interest cap applies to all consumer lenders except those lenders who are licensed under the Consumer Discount Company Act (hereinafter "CDCA"), 7 P.S. §§ 6201-6219, and who make loans in accordance with the limitations and requirements of that statute. *See Pa. Dept. of Banking v. NCAS of Delaware, LLC*, 948 A.2d 752 (Pa. 2008).

43.     Pennsylvania's interest-rate cap applies to all credit-related charges, however labeled, and applies to credit lines as well as fixed-amount loans. *Id*.

44.     As of February 1, 2009, "payday lending"—the "consumer lending practice in which a lender offers consumers high-rate, short-term loans secured by either a post-dated check or a debit authorization from a bank," *id*., 8 A.3d at 284—has been illegal in Pennsylvania, whether done through storefronts or over the Internet.

45.     FreedomCashLenders, Tremont Lending, Little Lake Lending, and Credit Cube are not licensed in Virginia, Georgia, or Pennsylvania (or any other state) and, thus, they and all participants in the enterprise are prohibited from making and collecting on any loans to citizens in excess of their respective state's interest-rate cap.

46.     Further, because of the failure to comply with state licensing requirements, Plaintiff Epperson and Williams's loans are are void, and Plaintiffs were never obligated to pay any amount on the invalid loans. *See* Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable

by the person by or for whom payment was made"); Ga. Code § 16-17-3 (any loan made in violation of Georgia's payday lending statue and Georgia's usury laws "shall be void ab initio").

**B.     Overview regarding the creation of the tribal lending business model and the shut down of Primus's rent-a-bank scheme.**

47.     It is unsurprising that so many states have enacted such laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009) (citing Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13 (2008)).

48.     Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable consumers."[2] The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

49.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra*, 69 Wash. & Lee L. Rev. at 759 (quoting Karen E. Francis, Note,

---

[2]  *See CFPB Finalizes Rule To Stop Payday Debt Traps*, CFPB (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

*Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

50.     It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra,* 69 Wash. & Lee L. Rev. at 759.

51.     Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[3] Payday lenders used the banks as the conduit for the loans because the National Bank Act allowed banks to charge "interest at the rate allowed by the laws of the State, Territory, or District where the bank" was located, 12 U.S.C. § 85, and some states do not have any interest rate caps.

52.     Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements—largely by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n. 16 (2012).

53.     Prior to the crackdown, one of the largest rent-a-bank arrangements involved an arrangement between Think Cash and First Bank of Delaware.

54.     Under the rent-a-bank arrangement, loans were originated in the name of First Bank of Delaware, but it served as nothing more than a nominal lender on behalf of Think Cash.

55.     In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans.

---

[3] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

56.     By contrast, Think Cash received the "excess" of the cash flow and handled all of the day-to-day responsibilities.

57.     Primus was the chief executive officer and chief operating officer of First Bank of Delaware and was responsible for its involvement in the rent-a-bank relationship with Think Cash.

58.     Beginning in 2008, the Federal Deposit Insurance Corporation took steps to shut down Think Finance's arrangement with First Bank of Delaware through a cease and desist ordering it to terminate its relationship with "all third-party lending programs."[4]

59.     In response to the crackdown on rent-a-bank arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes in an attempt to evade state laws. Johnson, *supra*, 61 Cath. U. L. Rev. at 399 n. 16; Martin & Schwartz, *supra*, 69 Wash. & Lee L. Rev. at 785. Like the rent-a-bank format, the loans would be originated in the name of a tribe, but the tribe would serve as nothing more than a nominal lender.

60.     For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

61.     Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*. Under either structure, Callaway claimed

---

[4] *See, e.g.*, *In the Matter of First National Bank*, Case No. FDIC-07-256b, Order to Cease and Desist, Order for Restitution, and Order to Pay (Oct. 9, 2008), *available at* https://www.fdic.gov/bank/individual/enforcement/2008-10-03.pdf.

"the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

62.     Over the past several years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied.[5] In addition, there have been multiple class actions and government enforcement actions that have returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *See generally Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-495 (E.D. Va.), Dec. 13, 2019 Order at Dkt. 141 (granting final approval of the class settlement); *see also* David Rees, *Historic settlement sees online lenders wiping out $380 million in debt. Virginians led the way*, The Virginian Pilot, available at https://www.pilotonline.com/business/consumer/dp-nw-online-lender-settlement-20191212-n7khtxn7tbbsbauzirehwmpgly-story.html; Press Release, Office of Att'y Gen., Ga., Attorney General Chris Carr Announces $40 Million Plus Settlement with Online Payday Lender (Feb. 8, 2017), https://law.georgia.gov/press-releases/2017-02-08/attorney-general-chris-carr-announces-40-million-plus-settlement-online ($23.5 million in compensation, $17 million in loan forgiveness, $1 million civil penalty, and $500,00 attorney's fees and costs).

---

[5] *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV157522JFWRAOX, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348, 793 S.E.2d 357, 366 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes*, 811 F.3d at 675; *Rideout v. CashCall, Inc.*, No. 216CV02817RFBVCF, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

63.     Two prominent perpetrators were also recently convicted and sentenced to prison for their roles.[6]

64.     Despite all of the litigation and enforcement efforts, Defendants continue to make, collect, and profit from their illegal loans made to consumers.

**C.      Defendants' tribal lending enterprise lends and collects money at rates that far exceed state usury laws.**

65.     In 2013, when the tribal lending model was emerging to replace the rent-a-bank model, the Tribe's Tribal Council enacted an ordinance establishing FreedomCashLenders.

66.     As early as July 3, 2013, consumers were able to obtain a loan from the website, www.freedomcashlenders.com.

67.     According to its website, FreedomCashLenders was the "online payday lender" that consumers could "trust" and approval would occur "within minutes."

68.     On its "FAQ" webpage, FreedomCashLenders indicated that it loaned anywhere from $300 up to $1,500 depending on the consumer's income and other lending criteria. The annual percentage rate, according to the website, charged on these loans ranged from 600-780%.

69.     Consistent with this, Plaintiff Epperson obtained an online loan from FreedomCashLenders on November 4, 2016, in the amount of $200.

70.     The annual percentage rate charged on Plaintiff Epperson's loan was 780%, requiring her to repay $1,055.43, in approximately eight months.

---

[6] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

71.    Plaintiff Epperson applied for and received her loan from an electronic device while she was locaed in Virginia.

72.    Plaintiff Epperson used her Virginia address when applying for the loans, and she used her Virginia bank account to receive the loans and for the subsequent ACH debits to pay down the loans.

73.    Between November 10, 2016, and June 23, 2017, Plaintiff Epperson paid at least $870 on this loan—the vast majority of which was credited as payment towards interest.

74.    Similarly, Tribal Council enacted an ordinance establishing Tremont Lending, and consumers were able to obtain a loan from the website, www.tremontlending.com, starting on or around November 1, 2012.

75.    According to its website, Tremont Lending offered "cash advance loan[s] (payday loan[s])" for "unexpected car repairs," "emergency medical or dental issues," "child's prescriptions," or "unexpected needs requiring fast cash." In other words, when a borrower was desperate and financially vulnerable, it could get cash from Tremont Lending "overnight."

76.    Upon information and belief, Tremont Lending offers usurious loans on comparable terms to FreedomCashLenders, *i.e.*, loan amounts ranging from $300-$1,500 with annual percentage rates of 600-850%.

77.    Consistent with this, Plaintiff Harrison obtained an online loan from Tremont Lending on December 8, 2016, in the amount of $200.

78.    The annual percentage rate charged on this loan was 668.41%, requiring Plaintiff Harrison to repay $1,198.92 in approximately three months.

79.    On March 19, 2017, Plaintiff Harrison obtained another online loan from Tremont Lending in the amount of $600.

80. The annual percentage rate charged on this loan was 680.68%, requiring Plaintiff Harrison to repay $1,299.78 in approximately three months.

81. Plaintiff Harrison applied for and received her loan from an electronic device while she was located in Pennsylvania.

82. Plaintiff Harrison used her Pennsylvania address when applying for the loans, and she used her Pennsylvania bank account to receive the loans and for the subsequent ACH debits to pay down the loans.

83. Plaintiff Harrison paid each of her loans in full, including the repayment of the usurious interest charged on the loans.

84. Similarly, within the past few years, Tribal Council enacted an ordinance establishing Little Lake Lending.

85. Upon information and belief, Little Lake Lending offers usurious loans on comparable terms to FreedomCashLenders and Tremont Lending, *i.e.*, loan amounts ranging from $300-$1,500 with annual percentage rates of 450-850%.

86. Consistent with this, Plaintiff Williams obtained an online loan from Little Lake Lending on May 22, 2019, in the amount of $1,000.

87. The annual percentage rate charged on this loan was 483.65%, requiring Plaintiff Williams to repay $1,625.84 in approximately five months.

88. Plaintiff Williams applied for and received his loan from an electronic device while he was located in Georgia.

89. Plaintiff Williams used his Georgia address when applying for the loans, and he used his Georgia bank account to receive the loans and for the subsequent ACH debits to pay down the loans.

90.     Between June 7, 2019, and September 13, 2019, Plaintiff Williams paid at least $1,531.74 on this loan—the vast majority of which was credited as payment towards interest.

91.     Similarly, within the past few years, Tribal Council enacted an ordinance establishing Credit Cube.

92.     Upon information and belief, Credit Cube offers usurious online loans on comparable terms to FreedomCashLenders, Tremont Lending, and Little Lake Lending, *i.e.*, loan amounts ranging from $300-$1,500 with annual percentage rates of 400-850%.

93.     Consistent with this, Plaintiff Mann obtained an online loan from Credit Cube on April 10, 2019, in the amount of $300.

94.     The annual percentage rate charged on this loan was 736.31%, requiring Plaintiff Mann to repay $653.47 in approximately three months.

95.     Plaintiff Mann applied for and received his loan from an electronic device while he was located in Virginia.

96.     Plaintiff Mann used his Virginia address when applying for the loans, and he used his Virginia bank account to receive the loans and for the subsequent ACH debits to pay down the loans.

97.     After the origination of his loan, Plaintiff Mann paid at least $80.00 on this loan—the vast majority of which was credited as payment towards interest.

98.     Because of the failure to comply with state licensing requirements, Plaintiffs Epperson, Williams, and Mann's loans were void, and Plaintiffs were never obligated to pay any amount on the invalid loans. *See* Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Ga. Code § 16-17-3 (any loan

made in violation of Georgia's payday lending statue and Georgia's usury laws "shall be void ab initio").

99.    Alternatively, even if the lenders were exempt from Virginia and Georgia's usury laws, the loans imposed interest rates in excess of Virginia and Georgia's usury caps and, thus, the usurious interest is void and may be recovered by Plaintiffs Epperson, Williams, and Mann.

100.    Additionally, Plaintiff Harrison's loan imposed an interest rate in excess of the six percent cap permitted in Pennsylvania, the usurious interest is void and may be recovered by Plaintiff Harrison.

**D.    Defendants are an enterprise engaged in violations of RICO.**

101.    RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1691(4) (emphasis added).

102.    The Supreme Court's decision in *Boyle v. United States*, recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

103.    Put differently, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); Boyle, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

104.    Here, Defendants are an association in fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

105.    The Big Valley Band of Pomo Indians (hereafter "Tribe") is a Native American tribal government that has been federally recognized since its treaty with the United States in 1851.

106.    The Tribe's reservation is located on approximately 120 miles north of the city of San Francisco.

107.    The Tribe's Tribal Council serves as its governing body and has the power to make laws and ordinances pursuant to the Tribe's Constitution and laws.

108.    The Tribe's Tribal Council is vested with significant power, including the power to create tribal business and negotiate with third-parties to assist with those businesses.

109.    Upon information and belief, it is within their power, as members comprising the Tribal Council, to shut down the operations of FreedomCashLenders, Tremont Lending, Little Lake Lending, and Credit Cube, including the ceasing of the collection of unlawful amounts from Plaintiffs and class members.

110.    Upon information and belief, Philip Gomez, Michael Gomez, Vivian McCloud, and Chris McCloud have been instrumental in facilitating the creation of the illegal lending business and each agreed to the collection of unlawful debt and conspired with the others herein to collect the unlawful debt from consumers.

111.    Upon information and belief, Philip Gomez, Michael Gomez, Vivian McCloud, and Chris McCloud have signed ordinances and participated in decisions with respect to the lending businesses—although it is likely that the vast majority of the day-to-day operations are outsourced to third parties.

112.    Upon information and belief, Philip Gomez, Michael Gomez, Vivian McCloud, and Chris McCloud have attended meetings related to the high-interest usurious loans offered by

FreedomCashLenders, Tremont Lending, Little Lake Lending, and Credit Cube, and have voted in favor of their making and collection of the usurious loans.

113.     On the other hand, Princeton Alterntaive Funding, PAIF, Burgess, Primus, Wojciechowski, Microbilt Financial Services Corporation, and LJP Consulting have knowingly arranged and provided the lending capital used to make the usurious loans to consumers.

114.     Although the Tribe hold itself out as the actual lender of these internet loans, a substantial amount of the money comes from PAIF, which is a pooled investment fund created to raise and provide the capital to fund the illegal loans and, in return, the vehicle upon which profits are returned to Princeton Alternative Funding and its investors, including Burgess, Primus, and companies owned directly or indirectly by them.

115.     In addition, upon information and belief, PAIF and the Tribe have entered into a loan and security agreement in order to protect PAIF's capital by: (1) granting it a security interest in the loans; and (2) imposing certain business restriction on the Tribe and its entities.

116.     Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities.

117.    Upon information and belief, the loan and security agreement between PAIF and the Tribe had most, if not all, of the common terms identified in the proceeding paragraph.

118.    As Burgess explained in his sworn testimony in another case: he has held an ownership interest in PAIF for "over 25 years" and he has "been in the business-to-business lending industry for about 35 years."

119.    In this capacity, Burgess is one of the primary individuals who participates in raising the capital to be provided to the lenders and who negotiates the terms of the loan and security agreements with the lenders.

120.    As alleged above, Primus assisted Burgess with the creation of PAIF and was its Chief Credit Officer. Primus is also the majority shareholder of Defendant LJP Consulting, which is one of the two managing members of PAIF.

121.    Similarly, Wojciechowski owns some of the shares in PAIF and is its chief financial officer and, thus, he is the executive responsible for managing the financial actions of PAIF, including its decision when to deploy more capital to the illegal lenders.

122.    Through their ownership in PAIF, as well as their conduct in aiding, abetting, facilitating, and funding the illegal loans, Princeton Alterntaive Funding, PAIF, Burgess, Primus, Wojciechowski, Microbilt Financial Services Corporation, and LJP Consulting have violated RICO and state usury laws.

123.    Through their ownership interest and participation in the enterprise, Defendants received amounts collected from Plaintiffs and the class members' loans.

**COUNT ONE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)**
**(CLASS CLAIM AGAINST PRINCETON ALTERNTAIVE FUNDING, PAIF,**
**BURGESS, PRIMUS, WOJCIECHOWSKI, MICROBILT FINANCIAL SERVICES**
**CORPORATION, AND LJP CONSULTING)**

124.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

125.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class, initially defined as:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Virginia, Pennsylvania, Georgia, or any other state other than Utah or Nevada.

126.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a subclass, initially defined as:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Virginia, Pennsylvania, Georgia, or any other state other than Utah or Nevada; and (3) where a payment was made or the loan was originated after October 20, 2016.

127.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by similar cases against others in the industry, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

128.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Princeton Alterntaive Funding, PAIF, Burgess, Primus, Wojciechowski,

Microbilt Financial Services Corporation, LJP Consulting, FreedomCashLenders, Tremont Lending, Little Lake Lending, Credit Cube, the Tribal Council, and others constitute an "enterprise" under RICO; (2) whether Defendants acquired and maintained an interest in the enterprise; and (3) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

129.     **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

130.     **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

131.     **Injunctive Relief Appropriate for the Class**.  **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise, including the receipt of any proceeds arising from the unlawful collection of debt; prohibiting Defendants from continuing to engage in the enterprise or selling the outstanding balances on the loans to any third parties.

132.    As alleged above, Defendants Princeton Alterntaive Funding, PAIF, Burgess, Primus, Wojciechowski, Microbilt Financial Services Corporation, and LJP Consulting by acquiring and maintaining interests in and control of the enterprise involved in the unlawful collection of debt.

133.    Defendants participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

134.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

135.    As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT TWO:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

136.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

137.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class, initially defined as:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Virginia, Pennsylvania, Georgia, or any other state other than Utah or Nevada.

138.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a subclass, initially defined as:

All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Virginia, Pennsylvania, Georgia, or any other state other than Utah or Nevada; and (3) where a payment was made or the loan was originated after October 20, 2016.

139.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by similar cases against others in the industry, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

140.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an "enterprise" under RICO existed; (2) whether Defendants conducted or participated in the enterprise's affairs; (3) whether the loans are "unlawful debt" for purposes of RICO; and (4) what is the proper recovery for Plaintiffs and the class members against each Defendant.

141.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

142.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the

action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

143.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

144.    **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein, including a prohibition on collections from consumers and/or the sale of the loans to third parties; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

145.    All of the loans made to Virginia, Pennsylvania, Georgia, and to other consumers throughout the United States (except Utah and Nevada) included an interest rate far in excess of twice the enforceable rate in the consumers' respective state.

146.    As alleged above, Defendants associated with an enterprise that existed for the purpose of collection of unlawful debt, agreed that the enterprise would engage in the collection of unlawful debt, and participated in the affairs of the enterprise.

147.    Defendants' participation in the enterprise violated § 1962(c) of RICO and caused Plaintiffs to repay amounts on unlawful loans.

148.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

**COUNT THREE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

149.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

150.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class, initially defined as:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Virginia, Pennsylvania, Georgia, or any other state other than Utah or Nevada.

151.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a subclass, initially defined as:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Virginia, Pennsylvania, Georgia, or any other state other than Utah or Nevada; and (3) where a payment was made or the loan was originated after October 20, 2016.

152.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by similar cases against others in the industry, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

153.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether an "enterprise" under RICO existed; (2) whether there was a conspiracy to collect unlawful debt; (3) at what point each defendant joined the conspiracy; (4) whether the loans are "unlawful debt" for purposes of RICO; and (5) what is the proper recovery for Plaintiffs and the class members against each Defendant.

154.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

155.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

156.    **Injunctive Relief Appropriate for the Class**.   **Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the enterprise; and ordering the dissolution of each Defendant that has engaged in the enterprise.

157.    As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to conspire to violate §§ 1962(b)-(c), including but not limited to: (1) the loan and security agreement; and (2) agreements related to the purchasing of shares with respect to the unlawful loans.

158.    Defendants conspired and agreed to advance a RICO undertaking and caused Plaintiffs to repay amounts on unlawful loans.

159.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

**COUNT FOUR:**
**VIOLATIONS OF LICENSING AND USURY LAWS**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

160.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

161.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in

Virginia, Georgia, or any other state other than Utah or Nevada; and (3) repaid any amount that was void or usurious under their respective state's law.

Plaintiffs Mann, Epperson, Williams, and Harrison are members of this class.

162.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Mann and Epperson bring this action on behalf of themselves and the following subclass—the "Virginia Subclass"—initially defined as follows:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Virginia.

163.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Williams bring this action on behalf of himself and the following subclass—the "Georgia Subclass"—initially defined as follows:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Georgia.

164.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Harrison bring this action on behalf of herself and the following subclass—the "Pennsylvania Subclass"—initially defined as follows:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Pennsylvania.

165.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

166. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

167. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

168. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants obtained a license to lend in any state; (2) whether Defendants' loans violate state licensing requirements, such as the Virginia Consumer Finance Act; (3) whether Defendants' loans violate state usury laws, such as Va. Code § 6.2-305 because the interest levels were too high; (4) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

169. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome

and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

170.    Virginia, Georgia, and many other states require all who engage in the business of making personal loans to be licensed.

171.    None of the Defendants were licensed to make loans in Virginia, Georgia or any other state in the United States.

172.    Because Defendants failed to obtain a license and charged excessive interest rates, the loans are null and void in Virginia and Georgia, as well as many other states. Accordingly, Plaintiffs and class members may disgorge the amounts received by Defendants. *See, e.g.*, Va. Code § 6.2-1541(A); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio").

173.    In addition to licensing violations, Defendants' loans violated the general usury laws of many states including Virginia and Pennsylvania. *See* Va. Code § 6.2-305(A); 41 P.S. § 201. As a result, Plaintiffs and class members are entitled to recover the applicable damages allowed by those state statutes, such as Va. Code § 6.2-305(A), which permits recovery of the total amount of interest received by a person, plus twice the amount of interest paid within the past two years. *See* Va. Code § 6.2-305(A).

174.     Pursuant to the structure, each Defendant received a percentage of the Plaintiffs and class members' payments, rendering them liable to Plaintiffs and the Class Members.

## COUNT FIVE:
## UNJUST ENRICHMENT
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

175.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

176.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Virginia, Georgia, or any other state other Utah or Nevada; and (3) repaid any amount that was void or usurious under their respective state's law.

> Plaintiffs Mann, Epperson, Williams, and Harrison are members of this class.

177.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Mann and Epperson bring this action on behalf of themselves and the following subclass—the "Virginia Subclass"—initially defined as follows:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Virginia; and (3) repaid any amount on their loan.

> Plaintiffs Mann and  Epperson are members of this class.

178.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Williams brings this action on behalf of himself and the following subclass—the "Georgia Subclass"—initially defined as follows:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Georgia; and (3) repaid any amount on their loan.

> Plaintiff Williams is a member of this class.

179.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Harrison brings this action on behalf of herself and the following subclass—the "Pennsylvania Subclass"— initially defined as follows:

> All individuals who: (1) entered into a loan agreement with FreedomCashLenders, Tremont Lending, Little Lake Lending, and/or Credit Cube; (2) while located in Pennsylvania; and (3) repaid any amount on their loan.

> Plaintiff Harrison is a member of this class.

180.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

181.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants when they paid a void loan; (2) whether each Defendant knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loan was void; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

182.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

183.  **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

184.  **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

185.  All loans made to consumers in Virginia, Georgia, and other states with similar licensing were void and unenforceable.

186.    Similarly, all loans made to consumers in Virginia, Pennsylvania, and other states with similar usury laws (except Utah and Nevada) were void and unenforceable as to the repayment of the usurious interest.

187.    Plaintiffs conferred a benefit on Defendants when they repaid the unenforceable amounts; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

188.    Accordingly, Plaintiffs seek to recover from Defendants, jointly and severally, all unlawful amounts repaid on any loans.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request the Court enter judgment for themselves and the class they seek to represent against Defendants, including for:

A.    Certification of this matter to proceed as a class action;

B.    Declaratory, injunctive, and compensatory relief as pled herein;

C.    Attorney's fees, litigation expenses, and costs of suit; and

D.    Any further relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By:    */s/ Kristi C. Kelly*
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Leonard A. Bennett, Esq., VSB #37523

Craig C. Marchiando, Esq., VSB #89736
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com
*Counsel for Plaintiffs*