**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| STEVEN MANN, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 3:20-cv-820 (REP) |
| | : | |
| PRINCETON ALTERNATIVE FUNDING, LLC, | : | |
| *et al.*, | : | |
| | : | |
| Defendants. | : | |

**OPPOSITION TO MOTION FOR SANCTIONS AGAINST PLAINTIFFS' COUNSEL**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 11**

Plaintiffs, by Counsel, respectfully submit this Memorandum in Opposition to the Motion for Sanctions Against Plaintiffs' Counsel Pursuant to Federal Rule of Civil Procedure 11. As explained in more detail below, the present motion for sanctions should be denied for two reasons. *First*, Plaintiffs' counsel withdrew the Class Complaint within 21 days of receipt of Defendants' Motion for Sanctions, thereby complying with the straightforward requirements of the safe harbor provision of Rule 11(c)(2). Because Rule 11 sanctions may be imposed "only if the challenged pleading is not withdrawn or corrected within twenty-one days," sanctions cannot be awarded pursuant to Rule 11. *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 389 (4th Cir. 2004). *Second*, Plaintiffs' Counsel had a good-faith basis for their factual contentions and claims based on the deposition testimony of Walter Wojciechowski, who expressly testified that Defendants provided lending capital to "Big Valley."

**BACKGROUND**

This motion for sanctions is part of Philip Burgess's vendetta against Plaintiffs' Counsel, whom Burgess has sued personally in New Jersey as part of his ongoing effort to obtain leverage

in the litigation pending against him in this Court. By way of example, Burgess, his wife, and their *minor children* have sued Mr. Bennett, Ms. Kelly, and their firms for "malicious abuse of legal process," "harassment," and "intentional infliction of emotional distress." *See Burgess v. Bennett*, Case No. 3:20-cv-7103 (D.N.J. 2020), Dkt. 1, attached hereto as Ex. 1.  In support of these claims, Burgess alleges that Bennett and Kelly attempted "to pressure" him to settle two cases pending before this Court by: (1) filing a motion to compel against Microbilt; and (2) serving subpoenas in their cases. Burgess further claims that a private process server—an employee of a reputable New Jersey based company that specializes in serving process—attempted to serve him without following COVID protocols, and the private process servers "were employed by" Mr. Bennett and Ms. Kelly and "were acting on the instructions" when carrying out their service. Ex. 1 ¶¶ 32-46.[1] Although those farcical issues are pending before another court, they provide helpful context for Burgess' litigation tactics underlying this equally frivolous motion for sanctions.

The present case arises from an illegal tribal lending scheme involving the Big Valley Band of Pomo Indians, a federally recognized Native American tribe. As the Court is aware, Plaintiffs' Counsel has been on the forefront of the litigation against these illegal lending enterprises, including cases against entities that fund these enterprises. *See generally Gibbs v. Plain Green*, *LLC*, Case No. 3:17-cv-495 (E.D. Va.), Dec. 13, 2019 Order at Dkt. 141 (granting final approval of the class settlement, which included two defendants alleged to have provided the capital used

---

[1] In fact, before Plaintiffs in filed the dismissal in this case, Burgess had requested on November 19, 2020, consent for leave to amend his complaint in the New Jersey matter based on the filing of the complaint in this case. According to Burgess's filing in that matter, Plaintiffs' counsel filed this matter "in bad faith purely to continue to tortuously interfere with the business of MicroBilt, and to cause the company and its people damage and legal fees, all of this because Mr. Burgess, Microbilt's founder and consultant, and other MicroBilt principals, have refused to cooperate with Defendants in their various EDVA actions against on of their adversaries, Matt Martorello." Burgess v. Bennett, Case No. 3:20-cv-7103, Dec. 10, 2010 Letter to Court, Dkt. 22 at 1.

by the enterprise to make the loans); *Galloway v. James Williams, Jr.*, 2020 WL 7482191 (E.D. Va. Dec. 18, 2020) (granting final approval of the class settlement, which included defendants alleged to have provided the capital used by the enterprise to make the loans); *Hengle v. Curry*, 2018 WL 3016289, at *1 (E.D. Va. June 15, 2018) (transferring a case against brought against a tribal lending enterprise, including an alleged an alleged investment fund and its creator that allegedly provided substantial capital used to make the loans). Far from a novel and vindictive attempt to harass Burgess as asserted by Defendants, Plaintiffs' Counsel have been involved in dozens of cases revolving around usurious online lending enterprises, including those who aid, abet, and facilitate these illegal schemes.[2]

For months prior to the commencement of this case, Plaintiffs' Counsel had been investigating a potential lawsuit related to loans originated in the name of Big Valley. While this investigation was pending, Plaintiffs' Counsel took the deposition of Walter Wojciechowski, the chief executive of Microbilt Corporation and Phil Burgess' business partner. During this

---

[2] *See, e.g.*, *Hayes v. Delbert Services Corp.*, Case No. 3:14-cv-258 (E.D. Va.); *Gillison v Lead Express, Inc.*, Case No. 3:16-cv-041 (E.D. Va.);*Gillam v. Koetting*, Case No. 3:18-cv-473 (E.D. Va.)*; Inscho, v. Johnson*, Case No. 1:17-cv-674 (E.D. Va.)*; Ashford v. Advance 'Til Payday, Inc.*, Case No. 3:15-cv-735 (E.D. Va.)*; Kirksey v. Sky Group USA*, Case No. 1:17-cv-535 (E.D. Va.)*;Montgomery v. IEG Holdings Corporation*, Case No. 7:17-cv-180 (W.D. Va.)*; Turnage v. Clarity Services, Inc.*, Case No. 3:14-cv-760 (E.D. Va.)*; Pettus v. The Servicing Company, LLC*, Case No. 3:15-cv-479 (E.D. Va.)*; Turnage v. Fair Dinkum, LLC*, Case No. 3:15-cv-616 (E.D. Va.)*; Jensen v. Clarity Services, Inc.*, Case No. 3:16-cv-312 (E.D. Va.); *Jensen v FactorTrust, Inc.*, Case No. 3:17-cv-181 (E.D. Va.); *Kirksey v. TrueAccord Corp.*, Case No. 1:17-cv-1190 (E.D. Va.); *White v. Experian Information Solutions, Inc.*, Case No. 3:16-cv-310 (E.D. Va.); *White v Chexsystems, Inc.*, Case No. 1:17-cv-540 (E.D. Va.); *Hunter v. NHCash.com, LLC*, Case No. 3:17-cv-348 (E.D. Va.); *Johnson v. LTD Financial*, Case No. 3:17-cv-655 (E.D. Va.); *Wiley v. Jardine*, Case No. 3:17-cv-11 (E.D. Va.); *Williams v. Big Picture Loans, LLC*, Case No. 3:17-cv-461 (E.D. Va.)*; Gibbs v. Rees*, Case No. 3:17-cv-386 (E.D. Va.)*; Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-495 (E.D. Va.); *Gilliam v. Riverside Alpha Group, Inc.*, Case No. 3:17-cv-575 (E.D. Va); *Gilliam v. BB&T*, Case No. 3:17-cv-722 (E.D. Va.); *Gibbs v. Haynes Investments, LLC*, Case No. 3:18-cv-48 (E.D. Va.); *Winchell v. Lexis Nexis Risk Solutions FL, Inc.*, Case No. 3:18-cv-47 (E.D. Va.); *Heath v. Trans Union, LLC*, Case No. 3:18-cv-720 (E.D. Va.).

deposition, Wojciechowski testified that one of their businesses, Princeton Alternative Income

Fund, "invested in lenders who made loans to consumers." Ex. 2, Wojciechowski Depo. at 51:9-

11 (June 18, 2020). In other words, Princeton Alternative Income Fund "issues what is the capital

lines to the lenders," *i.e.*, the money used to make the illegal loans to consumers. *Id.* at 52:1-3.

Wojciechowski further testified:

> The second operating line would be with, it's not a company. I am not sure what
> the entity is. Big Valley. It's called Big Valley and I am not sure of the outstanding
> amount at this point in time.

*Id.* at 52:11-15 (emphasis added). Based on Wojciechowski's testimony, as well as their counsel's

experience with other comparable lending enterprises, Plaintiffs filed this lawsuit because each of

them received loans from various entities claiming to be owned and operated by Big Valley. *See,*

*e.g.*, Ex. 3, May 22, 2019 Loan Agreement (indicating that the company was a "wholly-owned and

controlled business of the Big Valley Band of Pomo Indians of the Big Valley Rancheria").

On November 11, 2020, Defendants' Counsel sent correspondence and a Motion for

Sanctions to Plaintiffs' Counsel. *See generally* Ex. 4, Nov. 11, 2020 Correspondence. In essence,

Defendants' correspondence and documents asserted that Defendants provided the capital to a

tribal lending entity named "Big Valley Financial, LLC," *i.e.*, a different tribal lending entity

*purportedly* owned and operated by the Big Valley Band of Pomo Indians. *Id.* By contrast,

Plaintiffs' loans were originated in the name of FreedomCashLenders, Tremont Lending, Layma

d/b/a Little Lake Lending, and Credit Cube, *i.e.*, four other entities *purportedly* owned and

operated by the Big Valley. *See* Dkt. 14, Am. Compl. ¶ 3. Although Plaintiffs' Counsel views any

statement by Burgess with appropriate skepticism,[3] Plaintiffs nonetheless voluntarily dismissed

---

[3] As the Court will recall, Burgess previously filed a declaration in another matter claiming that he
has "no business interests in Virginia." Apr. 12, 2019 Declaration, attached as Ex. 5. Burgess's
declaration, however, omits that Burgess and his companies fund several tribal lenders doing

4

the claims against the non-tribal defendants and filed an amended complaint on December 1, 2020, within 21 days of receipt of the correspondence dated November 11, 2020. *See* Dkt. Nos. 13-14. The Amended Complaint also removed all reference to the non-tribal defendants. *See generally* Dkt. 14, Am. Compl.

Despite the dismissal of the claim against them, Defendants have nonetheless filed this Motion, arguing that "[e]ven though Plaintiffs' counsel has now withdrawn the Class Complaint against Defendants, this Court is permitted to grant sanctions in favor of Defendants for Plaintiffs' counsel's sanctionable conduct because such sanctions are mandatory." Dkt. 16 at 7 (citations omitted). As explained below, Defendants' Motion knowingly relies on outdated caselaw issued before the 1993 amendments to Rule 11, which added the safe harbor provisions. Because Rule 11 sanctions may be imposed "only if the challenged pleading is not withdrawn or corrected within twenty-one days," sanctions cannot be awarded in this case. *Brickwood Contractors*, 369 F.3d at 389. And even if this Rule 11 safe harbor did not exist, the Court should still deny the motion because a reasonable attorney would have believed the allegations about Defendants to be factually justified by the deposition testimony of Walter Wojciechowski.

## ARGUMENT

### I. The Court lacks authority to impose the requested sanctions because the challenged paper was withdrawn within 21 days.

Rule 11(c)(2) provides that a motion for sanctions must be served upon the opposing party "but it must not be filed or be presented to the court if the challenged paper, defense, contention,

---

business in Virginia, such as Big Valley, Rosebud, and Green Circle. The documents filed by Burgess in support of this motion further reveal that his company, as of September 30, 2019, had more than $30 million dollars in outstanding loans to usurious lenders, including one of Matt Martorello's companies, "SunUp." These examples prove that Burgess "derives substantial revenue" from this Commonwealth, thereby subjecting himself to personal jurisdiction pursuant to Virginia Code § 8.01-328.1(A).

or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." FED. R. CIV. PROC. 11(c)(2). Known as the "safe harbor" provision, this subsection "sets forth" in "mandatory terms" the "conditions under which sanctions may be imposed" in a case before a district court. *Brickwood Contractors*, 369 F.3d at 393. Those conditions are: (1) the "party seeking sanctions must serve the Rule 11 motion on the opposing party at least twenty-one days before filing the motion with the district court," and (2) "sanctions may be sought <u>only if</u> the challenged pleading is not withdrawn or corrected within twenty-one days after service of the motion." *Id*. at 388 (emphasis added). These two requirements are "conditions precedent to the imposition of sanctions under the rule" and "[i]f a non-compliant motion nonetheless is filed with the court," it "lacks authority to impose the requested sanctions." *Id*. at 389; *see also Colter v. Omni Ins. Co.*, 718 F. App'x 189, 192 (4th Cir. 2018) (affirming district court's denial of request for sanctions because movant failed to request sanctions in a separate motion and "also ran afoul of Rule 11(c)(2)'s safe harbor provision").

The "Fourth Circuit's *en banc* decision in *Brickwood* makes clear that a district court errs when it imposes Rule 11 sanctions" unless the conditions precedent in Rule 11(c)(2) are satisfied. *Echeverria v. Samuel I. White, P.C.*, 2019 WL 1375587, at *4 (E.D. Va. Feb. 12, 2019) (citing *Brickwood*, 369 F.3d at 397), *report & recommendation adopted*, 2019 WL 1441616 (E.D. Va. Mar. 28, 2019). Consistent with *Brickwood*, this Court has repeatedly denied motions for sanctions absent strict compliance with Rule 11(c)(2). *Echeverria*, 2019 WL 1375587, at *4 (holding "because Defendants failed to satisfy the procedural requirements, the Court lacks the authority to impose Defendants' requested Rule 11 sanctions"); *Lang v. Va. Beach Lifesaving Serv.*, 2013 WL 12098761, at *2 (E.D. Va. Apr. 23, 2013) (describing the requirements of Rule 11(c)(2) as "crystal clear" and denying a motion for sanctions because the plaintiff "failed to comply with the

'safe harbor' provision," thus "depriving the defendant of the opportunity to withdraw or correct the challenged" pleading); *Allie v. Whole Foods Mkt. Grp., Inc.*, 746 F. Supp. 2d 773, 778 (E.D. Va. 2010) (denying a motion because the plaintiff did not comply with "the procedural requirements for a Rule 11 sanction"); *Navy Fed. Credit Union v. LTD Fin. Servs., L.P*, 2019 WL 2203128, at *3 (E.D. Va. May 3, 2019) (denying a motion and explaining "before imposing such sanctions, a court must ensure that various procedural prerequisites have been satisfied, including the twenty-one day safe harbor period"); *see also TechINT Sols. Grp., LLC v. Sasnett*, 2019 WL 8275243, at *1 (W.D. Va. Mar. 4, 2019) (citing *Brickwood* and explaining that Rule 11(c)(2) "requires the party seeking sanctions to provide his adversary with notice and an opportunity to withdraw the offensive pleading prior to filing a motion for sanctions with the court").

And while this Court is bound by *Brickwood* regardless of contrary authority, it is important to note that every Circuit Court of Appeals to consider this issue has reached the same result. *See, e.g., Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir. 1995) ( "The plain language of [Rule 11(c)(1)(A)] indicates that this notice and opportunity prior to filing is mandatory. Plaintiffs did not comply with this procedural prerequisite. Therefore, the sanction and payment of costs and attorneys' fees ordered by the district court cannot be upheld under Rule 11."); *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1327–28 (2d Cir. 1995) ("[T]he 1993 amendment [to Rule 11] establishes a 'safe harbor' of 21 days during which factual or legal contentions may be withdrawn or appropriately corrected in order to avoid sanction."); *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 99 (3d Cir. 2008) ("Under amended Rule 11 and amended Rule 9011, a party cannot file a motion for sanctions or submit such a motion to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or corrected within twenty-one days after service of the motion on the offending

party."); *Ridder v. City of Springfield*, 109 F.3d 288, 296 (6th Cir.1997) ("[T]he rule is unquestionably explicit . . . that unless a movant has complied with the twenty-one day 'safe harbor' service, the motion for sanctions 'shall not be filed with or presented to the court.' ") (quoting FED. R. CIV. PROC. 11(c)(1)(A)).

Because Plaintiffs' Counsel withdrew the Class Complaint within the 21-day safe-harbor period, the Court cannot award the requested sanctions.

## II.    Defendants rely on cases predating the 1993 Amendments to Rule 11, which added the safe harbor provision.

Despite controlling authority to the contrary, which Plaintiffs' Counsel brought to Defense Counsel's attention before Defendants filed their Motion, Defendants nonetheless insist that "[e]ven though Plaintiffs' counsel has now withdrawn the Class Complaint against Defendants, this Court is permitted to grant sanctions in favor of Defendants for Plaintiffs' counsel's sanctionable conduct because such sanctions are mandatory." Dkt. 16 at 7 (citations omitted). In support of this argument, Defendants cite the Fourth Circuit's decision in *In re Kunstler*, 914 F.2d 505, 515 (4th Cir. 1990), asserting that it stands for the proposition that a "violation of Rule 11 is complete when the paper is filed" and "a voluntary dismissal does not expunge the Rule 11 violation." *Id*. (quoting *Cooter & Gell v. Hartmarx Corp.*, 110 S. Ct. 2447, 2455 (1990)).

Defendants' argument, to put it mildly, is frivolous because *Kunstler* and *Cooter & Gell* were decided before the 1993 amendments to Rule 11, which first added the safe harbor provision to the rule. *See, e.g.*, *Hadges & Kunstler v. Yonkers Racing Corp.*, 48 F.3d 1320, 1327–28 (2d Cir. 1995) ("[T]he 1993 amendment establishes a 'safe harbor' of 21 days during which factual or legal contentions may be withdrawn or appropriately corrected in order to avoid sanction."). In other words, the "effect of this amendment of Rule 11" was "to reverse the result in cases such as *Cooter & Gell*." *Photocircuits Corp. v. Marathon Agents, Inc.*, 162 F.R.D. 449, 452 (E.D.N.Y. 1995); *see*

*also Morroni v. Gunderson*, 169 F.R.D. 168, 171 (M.D. Fla. 1996) (explaining that *Cooter & Gell* "was decided in 1990, three years prior to the 1993 amendments, including the addition of the 21 day 'safe harbor' period to Rule 11. Thus, the 1993 amendments to Rule 11 had the effect of overruling *Cooter and Gell*[.]"); *Gomes v. Am. Century Cos., Inc.*, 2010 WL 1980201, at *2, n.4 (E.D. Cal. May 17, 2010) (explaining that compliance with Rule 11(c)(2) is mandatory and distinguishing *Cooter & Gell* because it "was decided before the 1993 amendments to Rule 11"). As one leading treatise has explained:

> [T]he 1993 amendment has altered the effect of the Supreme Court's 1990 ruling in *Cooter & Gell v. Hartmarx Corporation*, in which it was held that a district court may impose sanctions after a voluntary dismissal because, "[e]ven if the careless litigant quickly dismisses the action, the harm triggering Rule 11's concerns already has occurred." The safe harbor provision, however, which was added three years after the *Cooter & Gell* decision, explicitly provides parties with the opportunity to correct the harm by withdrawing the improper papers within twenty-one days. Thus, several courts have held that the 1993 amendment of Rule 11 superseded *Cooter & Gell* and precludes a district court from granting a motion for sanctions if the motion was served after a voluntary dismissal or a final judgment or if a voluntary dismissal occurs within the safe harbor period.

5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1337.2 (4th ed.) (internal citations omitted).

In addition to their reliance on outdated case law, Defendants also selectively cite this Court's decision in *Turton*, suggesting that sanctions are mandatory even when a filing is withdrawn. Dkt. 16 at 7 ("Even though Plaintiffs' counsel has now withdrawn the Class Complaint against Defendants, this Court is permitted to grant sanctions in favor of Defendants for Plaintiffs' counsel's sanctionable conduct because such sanctions are mandatory.") (citing *Turton*, 2015 WL 236699 at * 2-3). *Turton*, however, is easily distinguishable because the plaintiff in that case did not withdraw the complaint after receipt of the defendant's motion for sanctions. *See, Turton*, No. 3:14-cv-446, Aug. 15, 2014 Rule 11 Letter at Dkt. 65-1, attached as Exhibit 5. Because the plaintiff

did not withdraw the allegations within 21 days of receipt of the motion, the effect of the safe harbor provision was simply not an issue in *Turton*. *See Turton*, 2015 WL 236699 at *3 (noting that "Plaintiffs and their counsel were put on notice after the Amended Complaint was filed that their claims against him lacked factual and legal support, but that they nevertheless continued to pursue those claims.").

Although they suspect Defendants' reliance on outdated authority was intentional, Plaintiffs' Counsel sent correspondence to Defendants' counsel on December 9, 2020, requesting Defendants to withdraw this motion based on *Brickwood* and their reliance on cases decided before the 1993 Amendments to Rule 11. Ex. 6, Dec. 9, 2020 Correspondence from Kelly. Despite express notification of binding legal authority contrary to their position, Defendants refused to withdraw their erroneous argument that "[e]ven though Plaintiffs' counsel has now withdrawn the Class Complaint against Defendants, this Court is permitted to grant sanctions in favor of Defendants for Plaintiffs' counsel's sanctionable conduct because such sanctions are mandatory." Dkt. 16 at 7.

## III. A reasonable attorney would believe the allegations were factually and legally justified.

### A. The allegations in the Complaint were reasonably justified based on the deposition testimony of Wojciechowski, as well as counsel's experience in comparable cases.

Although Rule 11(c)(2)'s safe harbor provision should be the beginning and the end of the analysis, Plaintiffs' Counsel believes it is important to explain why sanctions would be inappropriate even if the safe harbor provision did not exist. Where a violation of Rule 11 is alleged, the "Fourth Circuit instructs that district courts consider whether the claims advanced in the pleading are supported by the facts and the law . . . before making a determination of improper purpose." *Turton*, 2015 WL 236699 at *2 (citing *In re Kunstler*, 914 F.2d at 518). In conducting

this analysis, "the standard is one of 'objective reasonableness' and the court must focus on 'whether a reasonable attorney in like circumstances could believe his actions to be factually and legally justified.'" *Id*. (quoting *Cabell v. Petty*, 810 F.2d 463, 466 (4th Cir. 1987)). When assessing the objective reasonableness, the "relevant circumstances must be considered, and factors such as time pressures and attorney experience may influence the court's reasonableness determination." *Id*. (citing FED. R. CIV. P. advisory committee's notes; *Kunstler*, 914 F.2d at 505).

Here, a reasonable attorney would believe Counsel's actions were factually justified in light of the deposition testimony of Walter Wojciechowski, who expressly testified that Defendants provided lending capital to "Big Valley." In particular, Wojciechowski expressly testified that one of his and Burgess's businesses, Princeton Alternative Income Fund, "invested in lenders who made loans to consumers." Ex. 2, Wojciechowski Depo. at 51:9-11 (June 18, 2020). In this capacity, Princeton Alternative Income Fund "issues what is the capital lines to the lenders," *i.e.*, the money used to make the illegal loans to consumers. *Id*. at 52:1-3. Wojciechowski further testified:

> The second operating line would be with, <u>it's not a company</u>. I am not sure what the entity is. <u>Big Valley</u>. It's called <u>Big Valley</u> and I am not sure of the outstanding amount at this point in time.

*Id*. at 52:11-15 (emphasis added). Wojciechowski's testimony is also consistent with the sworn testimony of Burgess in another matter, where he testified as follows:

> Q.   Mr. Burgess, you were a consultant to Fund Recovery Services, correct?
>
> A.   Indirectly. My family owns a majority interest in Microbilt Corporation. Microbilt Corporation has a majority interest in the fund, and Fund Recovery Services is a division of that fund.
>
> Q.   And the fund you're talking about is Princeton Alternative Investment Fund?

A.     Princeton Alternative Income Fund.

Q.     Income Fund. And Princeton Alternative Income Fund is the predecessor in interest to FRS?

A.     That's correct.

Q.     Let me start by asking you a little bit about your background and experience in the credit industry. Can you provide the court with a brief thumbnail sketch of your professional experience in the credit industry?

A.     I've owned this company or its predecessors for a little over 25 years, I think 28 years. <u>I've been in the business-to-business lending industry for about 35 years</u>.

Ex. 7, Hr'g Trans. 8:21-9:19 (emphasis added).

Based on the foregoing testimony, Plaintiffs' Counsel's action of filing the Complaint was justified and factually sound. Most notably, Wojciechowski expressly testified that Princeton Alternative Income Fund provided capital to "Big Valley," not "Big Valley Financial." By omitting the "Financial," Plaintiffs' Counsel reasonably interpreted Wojciechowski's statement as an admission of a relationship with the Big Valley Band of Pomo Indians and, thus, any lending entities purportedly owned and operated by it. This interpretation was further bolstered by Wojciechowski's statement that the "second operating line" was "not a company." Ex. 2 at 52:11-15. By specifying it was not a "company," Plaintiffs' Counsel reasonably interpreted the relationship to be between Defendants and the Tribe, *i.e.*, not one of its tribal-lending entities.

In addition to Wojciechowski's deposition testimony, Plaintiffs' Counsel's experience in similar cases provided it with a reasonable belief that there was a relationship between Defendants and Big Valley, not simply "Big Valley Financial." Indeed, this Court has previously recognized that Plaintiffs' counsel "have extensive backgrounds in complex and class action litigation and consumer protection litigation," including "significant experience in litigation class action lawsuits

against tribal lenders." *Galloway v. Williams, Jr.*, 2020 WL 7482191, at \*8 (E.D. Va. Dec. 18, 2020) (*citing, e.g.*, *Hayes, et al. v. Delbert Servs. Corp.*, 3:14-cv-00258-JAG, Dkt. No. 193 ¶ 4, 14 (Jan. 20, 2017)). In almost all of these cases, including *Williams*, *Galloway*, and *Gibbs*, similarly situated defendants (co-conspirators who provided the capital used to make the illegal loans) did not have a relationship with a single tribal lending entity, but rather funded multiple disguised lending entities purportedly owned by the Tribe.[4]

The claims against Defendants were also legally justified. Far from a novel or vindictive legal theory, multiple courts have permitted claims against the financiers of an illegal lending scheme. *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 308 (E.D. Va. 2019) (denying a motion to dismiss by defendants alleged to have "played an instrumental role in designing the improper Tribal lending business structure, provided necessary funding for such ventures, and reaped profits from the collection of repayments on the unlawful Loan Contracts"); *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 932 (E.D. Va. 2019) (denying a motion to dismiss where the plaintiffs alleged that a defendant financed a tribal lending scheme and explaining that a defendant's "its investment in Plain Green on numerous occasions (starting with $2,000,000 and going up to at least $20,000,000), Plaintiffs plausibly aver a high level of control because, without funding, the enterprise could not continue to grow its business or issue loans"); *Solomon v. Am. Web Loan*, 2019 WL 1320790, at \*9 (E.D. Va. Mar. 22, 2019) (noting "the Amended Complaint alleges

---

[4] For example, in the Think Finance litigation, the defendants created a fund known as "GPLS." According to Think Finance itself, GPLS was created "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See Think Fin., LLC*, No. 17-03106 (Banc. Tex.) (Dkt. 1, Compl. ¶ 24) (explaining the creation of GPLS). With the assistance a Chicago investment firm, "GPLS raised money from investors," and these funds were then used to expand the portfolios of Plain Green, Great Plains, and MobiLoans. *Id.* ¶ 25. GPLS's investors did not invest in a single one of these tribal lending entities but, rather, funded the entire usurious lending scheme across multiple entities.

sufficient facts to support a reasonable inference that Medley Defendants intended to associate with the unlawful enterprise. Plaintiffs' complaint alleges that Medley Fund provided its $22.9 million investment to grow the illegal lending scheme despite another potential investor backing out"); *Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 984 (N.D. Cal. 2019) (same).

Finally, it is important to note that the allegations in the Class Complaint were correct except for the misunderstanding stemming from Wojciechowski's deposition testimony. In other words, Plaintiffs' Counsel did not allege, accuse, or overstate the nature of Defendants' business or its role with these nefarious schemes. Defendants fund high-interest online lending companies, including several tribal lending enterprises, and their filing confirms this. Most notably, as of September 30, 2019, Princeton Alternative Income Fund had the following outstanding loans to usurious lenders:

| Credit Line | Status | Credit Line Principal (9/30/19) |
|---|---|---|
| SunUp | Active | $10,603,537 |
| Rosebud DRT | Active | 1,989,162 |
| Big Valley | Active | 361,583 |
| Rosebud RQC | Defaulted | 1,575,285 |
| Green Circle | Defaulted | 1,685,895 |
| Bristlecone | Defaulted | 9,578,625 |
| Argon | Defaulted | 2,039,778 |
| Credda | Defaulted | 860,633 |
| Shoreside | Defaulted | 1,870,851 |
| **Total Credit Line Principal** | | **$30,565,349** |

Dkt 16-1 at pg. 105. Thus, while these specific consumers may not have received a loan funded directly by Defendants, other consumers have.

> **B. A reasonable attorney should not be required to review thousands of docket entries prior to filing a complaint when they reasonably believe that sworn deposition testimony warranting the filing of the complaint.**

Rule 11(b)(2) provides that "[b]y presenting to the court a pleading," the attorney certifies that "to the best" of their "knowledge, information, and belief, formed after an inquiry reasonable

under the circumstances" that the "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." FED. R. CIV. PROC. 11(b)(2). "To be reasonable," the "prefiling factual investigation must uncover *some* information to support the allegations in the complaint." *Brubaker v. City of Richmond*, 943 F.2d 1363, 1373 (4th Cir. 1991) (emphasis added). In other words, "only the lack of *any* legal or factual basis is sanctionable." *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 153 (4th Cir. 2002) (emphasis added) (citing *Simpson v. Welch*, 900 F.2d 33, 36 (4th Cir. 1990)).

Ignoring this standard, Defendants contend that the filing was unreasonable because of "various publicly available documents" on PACER filed in Princeton Alternative Income Fund's bankruptcy. Dkt. 16 at 9; *see also In re Princeton Alternative Income Fund, L.P.*, Case No. 18-cv-14603 (D. N.J. Bankr.) (filed on March 9, 2018). But regardless of the information contained in Princeton Alternative Income Fund's bankruptcy—a case in which Plaintiffs and their counsel were not involved—Plaintiffs already had "some information to support the allegations in the complaint," *i.e.*, the deposition testimony of Wojciechowski. *Brubaker*, 943 F.2d at 1373; *see also Asterbadi v. Leitess*, 2005 WL 2009276, at *5 (E.D. Va. 2005) ("Plaintiff's attorneys' prefiling investigation was reasonable because there existed both a factual and legal basis for Plaintiff's Complaint."); *Field v. GMAC LLC*, 2009 WL 6560222, at *7 (E.D. Va. 2009) ("[T]he court fails to see how it could conclude plaintiff failed to conduct an objectively reasonable investigation of his own experiences and interactions with defendants, their attorneys, or various court and law enforcement officers in the course of the prior litigations."), *aff'd*, 328 F. App'x 873 (4th Cir. 2009)). Given Wojciechowski's testimony and personal involvement, it was objectively reasonable for Plaintiffs' counsel to file the Complaint.

What's more, Princeton Alternative Income Fund's bankruptcy spanned more than two years, resulting in over 1,150 docket entries. *See generally In re Princeton Alternative Income Fund, L.P.*, Case No. 18-cv-14603 (D. N.J. Bankr.) (filed on March 9, 2018). Under the circumstances, there was no reason to review each one of these docket entries—thousands of pages—where Plaintiffs' Counsel reasonably believed that they had direct testimony from Wojciechowski as to the relevant facts giving rise to the lawsuit. Indeed, Defendants do not even point to a document in the bankruptcy that would straightforwardly confirm that Princeton Alternative Income Fund's arrangement was *solely* with Big Valley Financial, not any of the other tribal lending entities purportedly owned by Big Valley. In short, nothing in the bankruptcy case contradicts the express testimony of Wojciechowski, which Plaintiffs' Counsel reasonably relied upon.

Instead of pointing to a document that would have clearly confirmed the lack of a relationship between PAIF and Big Valley's other tribal lending entities, Defendants argue that Plaintiffs should have known "the Bankruptcy Court removed the Debtors from possession and appointed a Chapter 11 Trustee" and, so the argument goes, that the "Trustee had operational authority over PAF/PAIF," which refutes "all allegations of RICO-based collections between PAF/PAIF and any lenders purportedly associated with Big Valley[.]" Dkt 16 at 11. This argument fails for several reasons. *First*, two of the Plaintiffs obtained loans prior to the commencement of the bankruptcy and, thus, the Trustee cannot possibly be responsible for the misconduct, or insulate PAIF from its own misconduct, at that time. *See* Compl., Dkt. 1 ¶ 61 (alleging that Epperson obtained a loan on November 4, 2016); Compl., Dkt. 1 ¶ 61 (alleging that Harrison obtained loans on December 8, 2016, and March 19, 2017). *Second*, regardless of the Trustee's control over

PAIF, this fact would not excuse the other Defendants, who knowingly funded and facilitated the illegal lending scheme.

*Third*, and relevant to all Plaintiffs, "[o]nce it is proven" that a person "was a member of the conspiracy," his "'membership in the conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action.'" *United States v. Cornell*, 780 F.3d 616, 632 (4th Cir. 2015) (quoting *United States v. Bennett*, 984 F.2d 597, 609 (4th Cir. 1993)); *see also United States v. DePriest*, 6 F.3d 1201, 1206 (7th Cir. 1993) (same); *United States v. Starrett*, 55 F.3d 1525, 1550 (11th Cir. 1995) (same). In other words, even if the Trustee was appointed for a limited time between November 1, 2018, and March 13, 2020, this is irrelevant because "a defendant who has joined a conspiracy continues to violate the law 'through every moment of [the conspiracy's] existence,' and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot." *United States v. Cornell*, 780 F.3d at 631–32 (quoting *Smith v. United States,* 568 U.S. 106, 111 (2013)). Because PAIF had entered into the conspiracy prior to the bankruptcy, it is liable for the actions of its co-conspirators until it proves an affirmative act of withdrawal. *See Hengle v. Asner*, 433 F. Supp. 3d 825, 891 (E.D. Va. 2020) (denying a motion to dismiss a conspiracy claim against two defendants who claimed to have ceased involvement with tribal lenders). And it still appears today that PAIF does business with Big Valley based on the testimony of Wojciechowski, who testified that he did not know the outstanding balance on the loan, only that it was not closed.

## IV.    No sanctions are warranted with respect to the Rule 41 Dismissal.

Defendants also contend that Plaintiffs' Counsel should be sanctioned because "in an effort to take a parting shot at Defendants, doubled down on their baseless accusations and made

additional false statements about Defendants being involved in an alleged RICO conspiracy that has no basis in fact." Dkt. 16 at 19. This request should be denied for two reasons.

*First*, Defendants admittedly did not send a Rule 11 Letter or Motion for Sanctions with respect to the Rule 41 Dismissal. Dkt. 16 at 20, n. 11. Despite the mandatory obligations imposed by Rule 11(c)(2), Defendants contend that an additional letter "would be superfluous and form over function where the allegations in the Class Complaint for which Plaintiffs' counsel was forewarned in the original Safe Harbor package was being without factual basis, also predicted the same false RICO conspiracy allegations in the Dismissal Filing." *Id*. But the Dismissal Filing did not repeat the "same false RICO conspiracy allegations" in the Class Complaint. Instead, Plaintiffs' counsel withdrew all allegations against Defendants with respect to FreedomCashLenders, Tremont Lending, Layma d/b/a Little Lake Lending, and Credit Cube, *i.e.*, the subject of the original, supposedly offending, Complaint. In particular, the Dismissal Filing states as follows:

> Pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, Plaintiffs hereby dismiss the above-styled action without prejudice against the Defendants Princeton Alternative Funding, LLC, Princeton Alternative Income Fund, L.P., Philip Burgess, Alonzo Primus, Walter Wojciechowski, Microbilt Financial Services Corporation, and LJP Consulting, LLC. Plaintiffs filed this complaint, in part, based on the deposition testimony of Walter Wojciechowski, who indicated that Defendants provided capital to a tribal lending entity owned by the Big Valley Band of Pomo Indians. <u>Based on representations from their counsel and documents provided, it appears that Defendants invested in a tribal lending entity known as "Big Valley Financial, LLC," *i.e.*, a different tribal lending entity owned by the Big Valley Band of Pomo Indians, but not the one who issued their loans.</u> Although Plaintiffs believe there is a conceivable basis to allege that Defendants are part of a single conspiracy, Plaintiffs are dismissing this case until more information is obtained from the tribal officials regarding the operations of their businesses.

Dkt. 15 (emphasis added). Far from doubling down, Plaintiffs' Counsel expressly acknowledge that it appeared Defendant did not invest in FreedomCashLenders, Tremont Lending, Layma d/b/a Little Lake Lending, and Credit Cube. In other words, Plaintiffs' counsel withdrew all references

to "the specific conduct that allegedly violate[d] Rule 11(b)" as identified in the correspondence from Defendants' counsel on November 11, 2020. FED. R. CIV. PROC. 11(c)(2) ("A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b).").

*Second*, there is nothing factually or legally false about Plaintiffs' Counsel's statement that "Although Plaintiffs' believe there is a conceivable basis to allege that Defendants are part of a single conspiracy …," *i.e.*, Big Valley's conspiracy to make usurious loans to consumers. From a factual perspective, Plaintiffs' Counsel did not allege, accuse, or overstate the nature of Defendants' business—they *knowingly* provide capital used to make these loans and retain significant controls over the business. Among other things, an express term of the Loan and Security Agreement ("LSA") states that Big Valley Financial will use the funds to originate loans "that have an annual percentage rate not less than two hundred twenty-five percent (225%) and not greater than nine hundred percent (900%)." *See* Oct. 28, 2016 LSA (Dkt. 16-3, pg. 6 at § 1.28(b)). In exchange for providing the capital—a $2,000,000 line of credit with a minimum utilization rate of 85% (*Id.* at pg. 17,  § 2.5)—the lender receives a fixed rate of return of 22% on the money loaned (*Id.* at pg. 10, § 1.46).

In addition, the LSA gives funders, like Defendants, considerable control over business, including: (1) determination of the "eligible states" where the tribal lender may lend, including Virginia, (*Id.* at pg. 7, § 1.29); (2) a security interest in all of the illegal loans (Dkt. 16-3, pgs. 22-23 at § 5.1); (3) "complete access to all" to the tribal lender and affiliates' "premises during normal business hours" (*Id.*  at pgs. 32-33, § 7.5); (4) complete control over the tribal lender's bank account (*Id.*  at pgs. 26, § 6.1); and (5) the power to appoint the "Administrative Agent," *i.e.*, the "servicer" of the portfolio who cannot be removed without the consent of the lender (*Id.* at pg. 2-

3, § 1.3). [5] The LSA further requires Big Valley to use "Microbilt Corporation" as the underwriting service provider for its loans. *Id.* at pg. 66.

Plaintiffs' Counsel's statement in the Dismissal Filing—that it was conceivable to allege a single conspiracy—was also legally correct. To state a claim for violation of RICO's conspiracy provision, it "does not require that a defendant have a role in directing an enterprise." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012); *see also Smithfield Foods*, 633 F. Supp. 2d at 231 ("To state a claim for conspiracy to violate Section 1962(c), it is not necessary for every defendant to personally qualify as an operator or manager of the RICO enterprise."). [6] Rather, in the Fourth Circuit, "simply agreeing to advance a RICO undertaking is sufficient." *Id.* "Once it has been shown that a conspiracy exists, the evidence need only establish *a slight connection* between the defendant and the conspiracy" to support a violation of § 1962(d). *United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992) (emphasis added). A "slight connection" is satisfied by showing "knowledge of the essential nature of the plan." *United States v. Morrow*, 914 F.2d 608, 612 (4th Cir. 1990).

Here, there is far more than a slight connection between Defendants and the Tribe, which is involved in an illegal lending scheme funded, in part, by Defendants. While Plaintiffs obtained loans from companies other than Big Valley Financial, there is a "conceivable basis to allege that Defendants are part of a single conspiracy," *i.e.*, the overarching scheme involving the Tribe to make and collect usurious loans throughout the country. Given Plaintiffs' Counsel's belief that they will obtain additional information during discovery in this matter about Defendants' role and

---

[5] As this Court has experienced in other cases, the "servicer" runs nearly all aspects of the tribal lending enterprise and receives a significant part of the proceeds.

[6] *United States v. Wilson*, 605 F.3d 985, 1019 (D.C. Cir. 2010) (explaining that after the Supreme Court's decision in *Salinas*, "every court of appeals to consider the question has held that the *Reves* operation or management test does not apply to conspiracy under § 1962(d)").

relationship with the Tribe, they have chosen to wait to assert claims against Princeton Alternative Funding, LLC, Princeton Alternative Income Fund, L.P., Philip Burgess, Alonzo Primus, Walter Wojciechowski, Microbilt Financial Services Corporation, and LJP Consulting, LLC until that time. And while it was "unnecessary" to explain this in the Rule 41 Filing according to Defendants, Dkt. 16 at 20, they had already sought to amend the Complaint in New Jersey and, thus, Plaintiffs' counsel provided more context so the underlying reason for the dismissal was clear.

## <u>CONCLUSION</u>

For the foregoing reasons, the Motion for Sanctions should be denied.

Respectfully submitted,
**PLAINTIFFS**

 /s/ *Kristi C. Kelly*
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq. VSB # 82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: 703-424-7576
Facsimile: 703-591-0167
Email:  kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of January, 2021, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

_____/s/_____
Kristi C. Kelly, Esq. VSB # 72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7576
Facsimile:  (703) 591-0167
E-mail:  kkelly@kellyguzzo.com
*Counsel for Plaintiffs*